**D.L. LEE & SONS, INC. and American Manufacturers Mutual Insurance Company, Plaintiffs,**

v.

**ADT SECURITY SYSTEMS, MID–SOUTH, INC., Defendant.**

**Civil Action No. CV594–008.**

United States District Court, S.D. Georgia, Waycross Division.

April 27, 1995.

Frederick Owen Ferrand, Swift, Currie, McGhee & Hiers, Atlanta, GA, William J. Edgar, Solomon & Edgar, Alma, GA, M. Theodore Solomon, II, Solomon & Edgar, Alma, GA, Michael R. Ross, Brookhollow Central, II, Houston, TX, for American Mfrs. Mut. Ins. Co.

Frederick Owen Ferrand, Swift, Currie, McGhee & Hiers, Atlanta, GA, M. Theodore Solomon, II, Solomon & Edgar, Alma, GA, Michael R. Ross, Brookhollow Central, II, Houston, TX, for D.L. Lee & Sons, Inc.

J. Thomas Whelchel, Whelchel, Brown, Readdick & Bumgartner, Brunswick, GA, Roy E. Paul, Frank Wilkens Seiler, Bouhan, Williams & Levy, Savannah, GA, Jane L. Peeples, Bouhan, Williams & Levy, Savannah, GA, Teresa Saggese Mills, Atlanta, GA, Joseph R. Odachowski, St. Simons Island, GA, for ADT Security Systems, Mid–South, Inc.

### ORDER

MOORE, District Judge.

Defendant ADT Security Systems, Mid–South, Inc. (hereinafter "ADT") moves this Court for summary judgment as to all claims asserted by Plaintiffs D.L. Lee (hereinafter "LEE") and American Manufacturers Mutual Insurance Company (hereinafter "AMM"). For the reasons stated below, Defendant's Consolidated Motion for Summary Judgment is **GRANTED**.

### FACTS

The following facts are in a large part uncontroverted. On February 25, 1988, D.L. Lee & Sons, Inc. entered into a contract with ADT for the design, installation, and continued maintenance of an automatic fire detection and protection system. LEE operated a meat packing plant in Bacon County, Georgia. ADT contacted Jerry Lee by a letter dated January 8, 1988, and proposed installing and maintaining a fire alarm system at the LEE plant. The contract entered into in 1988 required LEE to pay an annual service charge of $2,615.00. At the time of the fire, the annual service charge required was $3,027.00.

On July 21, 1992, a fire severely damaged the premises of LEE. The total damages claimed by LEE were in excess of thirteen million ($13,000,000.00) dollars. LEE had an insurance policy with American Manufactures Mutual Insurance Company (hereinafter "AMM"). Shortly after the fire, AMM began investigating the fire. Between August 3, 1992, and December 1993, in connection with claims made by LEE under the insurance policy, AMM made eight payments to LEE totalling $9,012,734.00, an amount now sought as subrogation from LEE.

Allen Stottlemire, Night-shift Supervisor of D.L. Lee Sanitation Department, first observed the fire above "smokehouse five" at approximately 11:45 p.m. on July 20, 1992. Stottlemire extinguished the visible fire; however, unbeknownst to him, the fire was still burning in the wall of the smokehouse. When Stottlemire checked the smokehouse for the fire at approximately 11:45 p.m., he turned off the power in smokehouse five. (Def.['s] Consol.Mot.Summ.J., Ex. L). After extinguishing the visible fire, Stottlemire called James Nail, his supervisor, to inform him of what had transpired. Nail told Stottlemire to watch the building and call him back if anything else happened. (Id.).

The next morning, July 21, 1992, at approximately 4:53 a.m., the fire had broken out again and Stottlemire called the Alma Fire Department. (Def.['s] Consol.Mot.Summ.J., Ex. O). Due to the size of the fire, the fire department was unable to extinguish it.

Before the fire, LEE was in the process of concluding construction of a 6,300 square feet building addition at the northernmost end of the existing facility. The building addition was constructed above and surrounding smokehouse five where the fire was first observed. The building addition was built over the existing structure and had no sprinkler system or fire detection equipment at the time of the fire. LEE admits that it disconnected certain heat detectors in the area of smokehouse five while completing construction in that area. LEE maintains that ADT failed to install heat sensors in the crawl space in the attic over the hallway or "stick vat room" next to smokehouse five, an omission which prevented the detection of the fire in its incipient stage.

It is undisputed that the alarm was de-powered at the time of the fire. However, it is hotly disputed as to who de-powered the alarm system. ADT maintains that Michael Hersey, the Assistant Supervisor of the Maintenance Department at D.L. Lee, de-powered the system. LEE maintains that an employee of ADT de-powered the system.

According to ADT's admission, at the time of the fire, "the Control Panel plug had been unplugged from the A.C. outlet" and "there was [neither] battery backup/direct current (D.C.) power to the Control Panel [nor] to the balance of the ADT equipment installed at the premises because at least one battery wire leading to the standby battery supply was disconnected." (Def.['s] Consol.Mot.Summ.J., Ex. N). Additionally, ADT admits that the "Fire Department disconnect button on the Control Panel was depressed" which rendered the system unable to transmit a fire alarm signal to the City of Alma Dispatcher Station. (Def.['s] Consol.Mot.Summ.J., Ex. N).

The control panel was installed by ADT at the LEE facility and was powered by alternating current electric power (A.C. power).

The system also had direct current battery back-up power (D.C. power). An illuminated green light would indicate that the system was powered; conversely, the absence of this light would indicate that the system was not powered by A.C. power. ADT claims that this illuminated green light was observable through the glass window portion of the door of the control panel. The control panel had a lock and the key was given to LEE at the time of the installation and remained in LEE's possession. Plaintiffs have retained custody of this control panel.

In the event of the activation of a heat detector, a fire alarm signal was to be electronically transmitted from the control panel to the police and fire dispatcher's office. The control panel had a fire department disconnect button which, when depressed, inhibited transmission of a fire alarm signal to the local authorities and thus, rendered the fire alarm signal transmission capability inoperable. The control panel had a trouble silence button which, when depressed, silenced the annunciation of beeping signals at LEE, signals which would be emitted if the system was troubled, e.g., the A.C. power was interrupted or disconnected.

In the contract between ADT and LEE (Def.['s] Consol.Mot.Summ.J. Ex. A), there is a limitation of actions clause which states:

**NO SUIT OR ACTION SHALL BE BROUGHT AGAINST ADT MORE THAN ONE (1) YEAR AFTER THE ACCRUAL OF THE CAUSE OF ACTION THEREFOR.** (emphasis in original).

Also, there is a limitation of liability clause, Paragraph "E" which states in pertinent part:

**IT IS UNDERSTOOD THAT ADT IS NOT AN INSURER, THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE CUSTOMER AND THAT THE AMOUNTS PAYABLE TO ADT HEREUNDER ARE BASED UPON THE VALUE OF THE SERVICES AND THE SCOPE OF LIABILITY AS HEREIN SET FORTH AND ARE UNRELATED TO THE VALUE OF THE CUSTOMER'S PROPERTY OR PROPERTY OF OTHERS LOCAT-**

ED IN CUSTOMER'S PREMISES.... THE CUSTOMER DOES NOT DESIRE THIS CONTRACT TO PROVIDE FOR FULL LIABILITY OF ADT AND AGREES THAT ADT SHALL BE EXEMPT FROM LIABILITY FOR LOSS, DAMAGE OR INJURY DUE DIRECTLY OR INDIRECTLY TO OCCURRENCE, OR CONSEQUENCES THEREFROM, WHICH THE SERVICES OR SYSTEM IS DESIGNED TO DETECT OR AVERT; THAT IF ADT SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE OR INJURY DUE TO A FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE ANNUAL SERVICE CHARGE OR $250.00 WHICHEVER IS GREATER, AS THE AGREED UPON DAMAGES AND NOT AS A PENALTY, AS THE EXCLUSIVE REMEDY. (emphasis in original).

LEE's copy of the aforementioned contract was destroyed in the fire. On September 22, 1992, Michael Ross, attorney for AMM and LEE, wrote a letter to Ms. Belsole, Assistant General Counsel of ADT, requesting ADT documents and, among other things, a complete copy of the contract between LEE and ADT. (Def.['s] Consol.Mot.Summ.J. Ex. C). LEE maintains that ADT did not send them a complete copy of the contract until January 28, 1994. ADT contends that William Von Waldner, the Service Manager of ADT's Savannah office, delivered by hand a copy of the contract to LEE's headquarters on August 3, 1992, approximately six weeks before receiving the request for documents. (Def.['s] Consol.Mot.Summ.J. Ex. B).

ADT contends that it responded to LEE's request of September 22, 1992, in a letter dated November 4, 1992 which stated that ADT would be "glad to consider your recent request for copies of ADT records once the documents that were to have been sent to ADT are received," (Def.['s] Consol.Mot.Summ.J. Ex. D), but that Michael Ross did not reply to their letter until December 6, 1993, which was thirteen months after ADT's response letter of November 4, 1992, and approximately five months after

the contractual limitations of action expired. (Def.['s] Consol.Mot.Summ.J. Ex. E).

## ANALYSIS

### Summary Judgment Standard

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). The Court's analysis ends "where there is no genuine issue of material fact and where the moving party is entitled to judgment as a matter of law." *Great Lakes Dredge & Dock Co. v. Miller,* 957 F.2d 1575, 1578 (11th Cir.1992); *Real Estate Fin. v. Resolution Trust Corp.,* 950 F.2d 1540, 1543 (11th Cir.1992) (both citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Thus, summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div., a Div. of BP Oil Co.,* 932 F.2d 1384, 1387–88 (11th Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991). The applicable substantive law governing the action determines whether an element is essential. *E.G., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1505 (11th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any,

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Goree v. Winnebago Indus., Inc.,* 958 F.2d 1537, 1539 (11th Cir.1992). The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir.1991), *cert. denied,* 506 U.S. 903, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992); *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. If the nonmoving party's response to the summary judgment motion consists of nothing more than mere conclusory allegations, then the Court must enter summary judgment in the moving party's favor. *Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir.1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [then] there is no genuine issue for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512; *Johns v. Jarrard,* 927 F.2d 551, 556 (11th Cir.1991).

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.* 951 F.2d 1235, 1237 (11th Cir.1992); *Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521, 1523 (11th Cir.1991). The Court must avoid weighing conflicting evidence. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 934 (11th Cir.1987). A mere "scintilla" of evidence supporting the opposing party's position, however, will not suffice. *E.g., Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989).

Defendant has moved for summary judgment on the following grounds:

1. Plaintiffs' action is barred by their failure to commence the action within one year from the date of its accrual;

2. Plaintiffs' warranty claims are further barred as a matter of law by a valid warranty disclaimer provision;

3. Plaintiffs' claims for violations of the Magnuson–Moss Warranty Act must be dismissed as a matter of law;

4. Count VI of Plaintiffs' complaint alleging fraudulent inducement, "Misrepresentation," and gross negligence should be dismissed by virtue of the merger clause, Paragraph "N" of the agreement;

5. In Paragraph "E" of the agreement entered into by the parties D.L. Lee agreed that ADT shall be exempt from any liability. Accordingly, the dismissal of Plaintiffs' complaint is required;

6. Alternatively, partial summary judgment must be granted and ADT's potential liability to Plaintiff must be limited in accordance with the express contractual limitation of liability set forth in Paragraph "E" of the contract;

7. Plaintiff D.L. Lee waived the right to increase the maximum amount of ADT's liability and, therefore, Plaintiffs are estopped from recovering damages in an amount greater than the amount agreed to by the parties;

8. Summary judgment is appropriate as to all allegations of negligent design, negligent installation, fraudulent inducement, or alleged misrepresentation based on the uncontroverted fact that the fire alarm system at issue was depowered at the time of the fire;

9. Summary judgment is appropriate as to all of the Plaintiffs' allegations, including allegations relating to the depowering of the system because Plaintiffs cannot prove causation as a matter of law; and

10. The subrogation claims asserted by Plaintiff American also must fail.

## I. One Year Limitation of Action

■ ADT claims that the Plaintiffs' action is barred as a matter of law by their failure to commence this action within one year from the date of the fire pursuant to the following terms of the contract:

NO SUIT OR ACTION SHALL BE BROUGHT AGAINST ADT MORE THAN ONE (1) YEAR AFTER THE ACCRUAL OF THE CAUSE OF ACTION THEREFOR. (emphasis in original).

The Georgia courts have permitted parties to contract as to a time limit less than the statutory limit within which an action may be brought so long as the period fixed is not so unreasonable as to raise a presumption of imposition or undue advantage in some way. *General Electric Credit Corp. v. Home Indemnity Company*, 168 Ga.App. 344, 309 S.E.2d 152, 156 (1983).

■ It is general contract law in Georgia that parties are free to contract about any subject matter, on any terms, unless prohibited by statute or public policy, and injury to the public interest clearly appears. *Tahoe–Vinings v. Vinings Partners*, 205 Ga.App. 829, 424 S.E.2d 30, 31 (1992). Parties laboring under no disabilities may make contracts on their own terms, and in the absence of fraud or mistake or terms that are illegal or contrary to public policy, they must abide by the contract. *American Demolition, Inc. v. Hapeville Hotel Limited Partnership*, 202 Ga.App. 107, 413 S.E.2d 749, 752 (1991).

■ The doctrine of equitable estoppel may be used to bar inequitable reliance on statutory or contractual time limitations. *Keefe v. Bahama Cruise Line*, 867 F.2d 1318, 1323 (11th Cir.1989). The principle of equitable estoppel, which is based upon the maxim that no man may take advantage of his own wrong, applies with equal force whether the limitation is contractual rather than statutory. *Id.* To successfully invoke this doctrine, the plaintiff must show that he/she:

was misled by the defendant or its agents so that [s]he delayed suit because of (a) an affirmative statement that the statutory

period to bring the actions was longer than it actually was, or (b) promise to make a better settlement of the claim if plaintiff did not bring the suit or (c) comparable representations and conduct. *Id.* at 1323–24.

Part (c) is the "catch-all" encompassing all manners of conduct. *Id.* at 1324.

■ In deciding whether to invoke equitable estoppel, the court focuses on the defendant's conduct. *Barton v. Peterson*, 733 F.Supp. 1482, 1490 (N.D.Ga.1990). To invoke the protection of the equitable estoppel doctrine, the plaintiff need not prove bad faith on the part of the defendant, but must prove that the conduct was directed towards obtaining a delay in bringing suit, and was motivated by a desire to lull the plaintiff into not bringing a lawsuit. *Id.* at 1491.

■ Plaintiffs have not come forward with any evidence that the Defendants delayed Plaintiffs into bring this suit because of comparable representations or conduct. The Plaintiffs, as the nonmoving party, responded to Defendant's motion with mere conclusory allegations; therefore, the Court must grant summary judgment in the moving party's favor. *Peppers v. Coates*, 887 F.2d at 1498. Plaintiffs must go beyond the pleadings and show that there is a genuine issue as to facts material to the nonmovant's case. Because they failed to meet their burden, summary judgment is appropriate. *Thompson*, 934 F.2d at 1583.

In support of its claim that no fraudulent behavior sullied the sanctity of the bargained-for limitation of actions provision, ADT claims that William Von Waldner personally delivered a copy of the entire one-page contract to LEE on August 3, 1992, eleven months before the contractually mandated deadline for filing an action. (Def.['s] Consol.Mot.Summ.J. Ex. B). LEE disputes that said copy was delivered and maintains that, although it requested a copy of the entire contract (back and front) several times (Pls.['] Opp.Def.['s] Consol.Mot.Summ.J. Ex. 24), ADT did not give them a complete copy until January 28, 1994, six months after the contractual limitation of actions expired. In the record, A.G. Lee, the secretary-treasurer

of LEE, states that he requested a copy of the contract on July 21, 1992, from ADT but was never given a copy of said contract. (Pls.['] Opp.Def.['s] Consol.Mot.Summ.J. Ex. 24). Michael Ross, attorney for AMM, states that A.G. Lee was given a copy of the first page of the contract when A.G. Lee requested it. (Pls.['] Opp.Def.['s] Consol.Mot.Summ.J.Ex. 30). Ross states that he verbally requested a complete copy of the contract on numerous occasions in his telephone conversations with Ms. Belsole as well as a request by letter. (Pls.['] Opp.Def.['s] Consol.Mot.Summ.J. Ex. 30). Ross also states that he requested a complete copy of the contract by letters dated December 6, 1993, December 14, 1993, January 27, 1994, as well as mentioning it again in a letter dated March 4, 1994. (Pls.['] Opp.Def.['s] Consol.Mot.Summ.J. Ex. 30). However, all of these requests, excluding the September 22, 1992, letter, occurred *after* the expiration of the limitation of action. LEE maintains that ADT failed to give them a copy of the entire contract so as to delay LEE's filing of this action to a date when it would be time barred.

Whether or not ADT gave LEE a copy of the contract is not a material fact for deciding the limitation of actions clause in the contract.

A person who signs a contract is imputed with knowledge of the contents of that contract. Specifically, everyone is charged with the responsibility of reading and knowing the contents of a contract which he signs. *Bradley v. Swift & Co.*, 93 Ga.App. 842, 93 S.E.2d 364 (1956); *see Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666, 672 (N.D.Ga.1982).

It is uncontroverted that, on February 25, 1988, LEE executed a contract with ADT. (Pls.['] Br.Opp. to Mot.Summ.J., p. 1). The agreement was executed on LEE's behalf by its Secretary–Treasurer A.G. Lee. Therefore, LEE and A.G. Lee are imputed with the knowledge of the contents of the contract. *Bradley*, 93 S.E.2d 364; *Management Assistance, Inc.*, 546 F.Supp. at 672.

The contract is a one page document with contents on both sides. The limitations and exclusions are on the back side. However, above the signature line is a bold and capitalized sentence which states:

**ATTENTION IS DIRECTED TO THE WARRANTY, LIMIT OF LIABILITY AND OTHER CONDITIONS ON REVERSE SIDE.** (emphasis in original) (Def.['s] Mot.Summ.J. Ex. A).

While Plaintiffs argue that ADT was required to present LEE with another copy of the contract after the fire destroyed the original copy, this Court does not agree with that supposition. The cases cited by Plaintiffs deal with situations where there was a duty to provide the party with a contract, such as an insurance case or a case involving negotiations between a franchisor and franchisee. No such situation exists here. ADT is not an insurer of LEE nor is there any duty to provide them with a copy of the contract.

Plaintiffs were given the opportunity to provide the Court with case law to support their position. However, after reviewing the briefs, the Court is not convinced that ADT was under a duty to provide LEE with a copy of the contract.

Under Georgia law, concealment of material fact when one is under a duty to speak constitutes fraud. *Williams v. Dresser Industries, Inc.*, 795 F.Supp. 1144, 1147 (N.D.Ga.1992) (The plaintiff need not allege a strict fiduciary or confidential relationship in order to sustain claims for fraudulent concealment and misrepresentation in a franchisee-franchisor contract. Since the fraud occurred during a critical stage of negotiating their contract, the franchisor was under a greater duty to disclose). "Thus, while the duty to disclose may be less great where the parties are already obligated under the terms of an *existing* franchise agreement, that duty must be distinguished from the one called for by the situation involving negotiations for the *entering into* of such an agreement." *Id.* at 1148 (emphasis in original). The mere failure to disclose a fact, even if material, will not constitute fraud in the absence of a duty to make such disclosure. *Id.* at 1148.

A party to a contract containing a limitations clause was not equitably estopped from asserting the limitations period by failing to

provide the opponent with a copy of the contract before commencing the action. *Par Fait Originals v. ADT Security Systems, Northeast, Inc.,* 184 A.D.2d 472, 586 N.Y.S.2d 2 (1992). A party who signs a document is conclusively bound by its terms absent a valid excuse for having failed to read it. *Id.* The court held that the one year statute of limitations was enforceable and there was "no merit to plaintiffs' claim that since they were unaware of the contract at the time of the loss and were awaiting a copy from defendant before commencing this action, defendant should be equitably estopped from asserting the contractual one-year limitations period." *Id.* The court held that equitable estoppel requires justifiable reliance which was not present; therefore dismissal of the claims was proper. *Id.*

As a result of the foregoing reasons, ADT's motion for summary judgment is granted. ADT is not equitably estopped from asserting the contractual limitations of actions; there is no evidence that ADT acted in any manner to delay LEE in bringing the suit. LEE freely contracted with ADT and had, at the very least, constructive knowledge of the contents of the contract; therefore, LEE is bound by the contents of the contract that it signed. Since there is no evidence of fraud or fraudulent inducement, ADT is not estopped from asserting its contractual limitations of actions.

Although the one year contractual limitations decides this case substantively, the Court will continue its analysis and address the merits of the remaining issues.

II. *Whether the transaction between ADT and LEE is a sale so as to afford LEE the protection of the Uniform Commercial Code and the Magnuson–Moss Act.*

■ The transaction between ADT and LEE was not a sale; therefore the U.C.C. is not applicable. Under the law of Georgia, implied warranties can arise under contracts for the "sale" of goods. O.C.G.A. 11–2–316.

A "sale" consists in the passing of title from the seller to the buyer for a price. U.C.C. § 2–106; O.C.G.A. 11–2–106(1). The contract between ADT and Lee expressly provides that the system is to remain proper-

ty of ADT. *Craig v. American District Telegraph Co.,* 91 Misc.2d 1063, 399 N.Y.S.2d 164, 165 (1977). The parties were able to choose between two options when characterizing the transaction, (1) "Direct Sale (equipment to become property of the Customer upon payment of selling Price indicated below in full)"; or (2) "System to remain property of ADT." Clearly, if the parties had intended to contract for a sale the first box would have been marked and not the second box. Since the transaction between LEE and ADT is not a sale, there can be no cause of action for breach of implied warranty based upon the U.C.C..

The U.C.C. applies only to the "sale" of goods and does not apply to the sale of services. *Steiner Corp. v. American District Telegraph,* 106 Idaho 787, 683 P.2d 435, 438 (1984). In *Steiner,* ADT agreed to supply the fire alarm system, but, by the clear terms of the contract the system remained the property of ADT. *Id.* 683 P.2d at 437–38. Like the case at bar, the transaction was not a sale because the product was not placed in the control of the customer. *Id.* at 438. As in *Steiner,* the "product," the fire alarm system, remained entirely in the control of ADT and the contract obligated ADT only to provide a service, system maintenance. *Id.* In *Steiner,* the court held U.C.C. did not apply because the contract was not a contract for the sale of goods, but was a service contract. Because the U.C.C. did not apply, there was no cause of action for implied warranties under that statute. *Id.* at 438.

The Court finds that the agreement between ADT and LEE to install and maintain a protective alarm system was not a sale and therefore is not subject to the U.C.C. *Ford v. Rollins Protective Services Company,* 171 Ga.App. 882, 322 S.E.2d 62 (1984) (Since the installation-service agreement was not a sale, the U.C.C. and comparable Georgia statutes do not apply). As a result, the implied warranty and other U.C.C. considerations are not applicable.

*Warranties*

■ Defendant claims, in the alternative, that even if Plaintiffs' action is not barred by the limitation of actions, the Plaintiffs' war-

ranty claims are barred as a matter of law by a warranty disclaimer provision in the ADT/LEE contract. The disclaimer reads:

> ADT MAKES NO GUARANTY OR WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS, THAT THE SYSTEM OR SERVICES SUPPLIED, WILL AVERT OR PREVENT OCCURRENCES OR THE CONSEQUENCES THEREFROM, WHICH THE SYSTEM OR SERVICE IS DESIGNED TO DETECT. (Def.['s] Consol. Mot. Summ. J. Ex. A) (emphasis in original).

As shown, this warranty disclaimer is in bold typeface and capitalized on the back of the contract. On the front of the contract above the customer's signature, the contract states:

> ATTENTION IS DIRECTED TO THE WARRANTY, LIMIT OF LIABILITY AND OTHER CONDITIONS ON REVERSE SIDE. (Def.['s] Consol.Mot.Summ.J. Ex. A) (emphasis in original).

Warranty disclaimers are upheld if conspicuous. O.C.G.A. § 11-1-201(10) provides:

> " 'Conspicuous': A term is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." A printed heading in capitals (as: Nonnegotiable Bill of Lading) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous." Whether a term or clause is "conspicuous" or not is for decision by the court.

The Court finds that, as both paragraphs regarding the warranty are bolded and in all capital letters, the warranty disclaimer is conspicuous as a matter of law. *See generally Leland Industries, Inc. v. Suntek Industries, Inc.*, 184 Ga.App. 635, 362 S.E.2d 441, 443 (1987) (Language in the body of a form is conspicuous if it is in larger or other contrasting type or color.).

Having found that ADT made no explicit warranty to LEE by the terms of the contract, the Court examines whether ADT could be liable to LEE under an implied warranty. Assuming *arguendo* that the

U.C.C. was applicable, the warranty disclaimer was conspicuous as a matter of law; therefore, the disclaimer is valid and the claims are dismissed. *Leland Industries, Inc.*, 362 S.E.2d 441.

*Magnuson–Moss Act Claims*

 Plaintiff claims that the warranty provisions of the contract are in violation of the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act, 15 U.S.C. § 2301, et seq. (hereinafter "Act"). Specifically, Plaintiff claims that the provisions violate 15 U.S.C. § 2308 which states:

> (a) No supplier may disclaim or modify (except as provided in subsection (b) of this section) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.

> (b) For purposes of this chapter (other than section 2304(a)(2) of this title), implied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty.

> (c) A disclaimer, modification, or limitation made in violation of this section shall be ineffective for purposes of this chapter and State law.

Defendant ADT claims that the Act is not applicable to this case because the transaction between ADT and LEE was not a sale. There must be an identifiable purchase and sale before the provisions of the Magnuson–Moss Act apply. *Sellers v. Frank Griffin AMC Jeep, Inc.*, 526 So.2d 147, 156 (Dist.Ct. Fla.1988).

The Act applies to the "sale" of "consumer products." The Magnuson–Moss Act applies to a "supplier" and a "buyer" of any "consumer product" and certain qualified non-

buyers. 15 U.S.C. § 2301 et seq. The term "consumer" means a

> buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract). 15 U.S.C. § 2301(3).

Courts have held that a contract for the installation and service of a fire and burglary alarm system was not a sales transaction involving a consumer product subject to the express warranty provisions of the Magnuson–Moss Act. *Corral v. Rollins Protective Services Co.*, 240 Kan. 678, 732 P.2d 1260, 1266 (1987). In *Corral*, the supreme court of Kansas affirmed the trial court's granting of summary judgment stating that in the absence of a sale there were no warranties that were protected by the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act. *Id.* Similar to the case at bar, the *Corral* contract stated that the protective system was to remain the personal property of Rollins, that title was to continue in Rollins, that Rollins was not an insurer, and that the charges paid to Rollins were based solely on the cost of installation and service of the fire and burglar alarm system. *Id.* 732 P.2d at 1262–63. The court also stated:

> Warranties on service are not covered under the Act. 16 C.F.R. § 700.1(h) (1986). Also, the Act does not apply to leases of consumer products since a "written warranty" under the Act only arises in connection with the "sale" of a consumer product. 15 U.S.C. § 2301(6). Thus, the Act literally covers only warranties on a consumer product "sold" to a consumer. Clark and Smith, The Law of Product Warranties, ¶ 15.08 (1986 Supp.). *Id.* at 1267.

The *Corral* court discussed several other cases which held the Act would apply to leases or service agreements; however, the *Corral* court found them distinguishable. *Id.* at 1267; *Henderson v. Benson–Hartman Motors, Inc.*, 41 U.C.C.Rep.Serv. 782, 1983 WL 160532 (Callaghan 1983) (The court extended the Act to an automobile lease which had most of the characteristics of a sale); *Freeman v. Hubco Leasing, Inc.*, 253 Ga. 698, 324 S.E.2d 462 (1985) (A forty-eight month lease with a final lump sum payment at end of lease in which plaintiff would own the car was an installment sale contract rather than a lease; therefore, the Act applied.); *Business Modeling v. GMC*, 123 Misc.2d 605, 474 N.Y.S.2d 258 (1984) (The court allowed the lessee of an automobile to proceed against the lessor under the terms of the Act.). Because the case at bar is distinguishable from these cases, this Court finds that the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act does not apply. Like the *Corral* contract, the LEE/ADT contract shows no characteristics of a sale.

Given the option of contracting for a direct sale or for the system to remain in property of ADT, the parties chose for the transaction not to be a sale.[1] The parties were free to contract for the direct sale but they did not; therefore, the transaction between ADT and LEE was not a sale. *Tahoe–Vinings v. Vinings Partners*, 205 Ga.App. 829, 424 S.E.2d 30, 31 (1992). Because this transaction was not a sale, the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act is not applicable. Defendant's Motion for Summary Judgment regarding violations of the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act is granted.

### III. *Merger Clause Claims*

Plaintiff asserts claims of fraudulent inducement, misrepresentation, and gross negligence. Defendant contends that these claims should be dismissed due to the

---

**1.** There were two types of transactions available to ADT and LEE in the contract:

Direct Sale (equipment to become property of the customer upon payment of Selling Price indicated below in full).

merger clause in the contract.[2] A clause in a contract limiting liability for negligent acts does not serve to limit liability for wilful and wanton conduct. *Peck v. Rollins Protective Services, Inc.*, 189 Ga.App. 381, 375 S.E.2d 494, 496 (1988). A merger clause can have no bearing where fraud in procuring the signing of the instrument is the issue. *Lenny's Inc. v. Allied Sign Erectors, Inc.*, 170 Ga.App. 706, 318 S.E.2d 140, 141–42 (1984).

■ Because there has been no evidence produced that ADT fraudulently induced LEE to sign the contract[3], summary judgment on this issue of the merger clause claims is granted.

## IV. *Limitation of Liability*

■ Defendant claims that it is exempt from any liability as mandated by paragraph "E" of the contract at issue. In the pertinent part, paragraph "E" states:

IT IS UNDERSTOOD THAT ADT IS NOT AN INSURER, THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE CUSTOMER AND THAT THE AMOUNTS PAYABLE TO ADT HEREUNDER ARE BASED UPON THE VALUE OF THE SERVICES AND THE SCOPE OF LIABILITY AS HEREIN SET FORTH AND ARE UNRELATED TO THE VALUE OF THE CUSTOMER'S PROPERTY OR PROPERTY OF OTHERS LOCATED IN CUSTOMER'S PREMISES.... THE CUSTOMER DOES NOT DESIRE THIS CONTRACT TO PROVIDE FOR FULL LIABILITY OF ADT AND

AGREES THAT ADT SHALL BE EXEMPT FROM LIABILITY FOR LOSS, DAMAGE OR INJURY DUE DIRECTLY OR INDIRECTLY TO OCCURRENCE, OR CONSEQUENCES THEREFROM, WHICH THE SERVICES OR SYSTEM IS DESIGNED TO DETECT OR AVERT; THAT IF ADT SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE OR INJURY DUE TO A FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE ANNUAL SERVICE CHARGE OR $250.00 WHICHEVER IS GREATER, AS THE AGREED UPON DAMAGES AND NOT AS A PENALTY, AS THE EXCLUSIVE REMEDY. (emphasis in original) (Def.['s] Consol.Mot.Summ.J. Ex. A).

In the event of the Court's denial Defendant's motion for summary judgment, Defendant asserts that partial summary judgment must be granted so as to limit ADT's liability to 10% of the annual service charge or $302.70, as specificized in the contract.

Limitation of liability clauses involving fire and burglar alarms are commonly ruled enforceable by courts. *Leon's Bakery, Inc.*, 990 F.2d 44, 48 (2d Cir.1993)[4] (Limitation of liability clause upheld because the monitoring fee was not high enough to include theft insurance premium.); *E.H. Ashley & Co. v. Wells Fargo Alarm Services*, 907 F.2d 1274, 1278–79 (1st Cir.1990) (Not inappropriate to place on user the onus of buying insurance on user); *Accord Shaer Shoe Corp. v. Gran-*

or
System to remain property of ADT.

2. N. THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE CUSTOMER AND ADT. IN EXECUTING THIS AGREEMENT, CUSTOMER IS NOT RELYING ON ANY ADVICE OR ADVERTISEMENT OF ADT. CUSTOMER AGREES THAT ANY REPRESENTATION, PROMISE, CONDITION, INDUCEMENT OR WARRANTY, EXPRESS OR IMPLIED, NOT INCLUDED IN WRITING IN THIS AGREEMENT SHALL NOT BE BINDING UPON ANY PARTY, AND THAT THE TERMS AND CONDITIONS HEREOF APPLY AS PRINTED WITHOUT ALTERATION OR QUALIFICATION, EXCEPT AS SPECIFICALLY MODIFIED IN WRITING. THE TERMS

AND CONDITIONS OF THIS AGREEMENT SHALL GOVERN NOTWITHSTANDING ANY INCONSISTENT OR ADDITIONAL TERMS AND CONDITIONS OF ANY PURCHASE ORDER OR OTHER DOCUMENT SUBMITTED BY THE CUSTOMER. (emphasis in original) (Def.['s] Consol.Mot.Summ.J. Ex. A).

3. *See* discussion *supra* pp. 1577–1579.

4. In making a determination limiting liability, a federal court is free to consider all of the resources to which the highest court of the state could look, including decisions in other jurisdictions on the same or analogous issues. *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir.1993).

*ite State Alarm, Inc.*, 110 N.H. 132, 262 A.2d 285, 286–87 (1970) (applying New Hampshire law and citing cases from Texas, California, and Alabama); *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 962–63, 593 N.E.2d 1365, 1370–71 (1992) (Limitation of liability clauses in fire alarm contract enforceable as to claim of ordinary negligence but not as to claim of gross negligence.); *Abel Holding Co. v. American District Telegraph Co.*, 138 N.J.Super. 137, 350 A.2d 292, 296–302 (Law Div.1975), *aff'd*, 147 N.J.Super. 263, 371 A.2d 111 (App.Div.1977); *E.H. Ashley & Co. v. Wells Fargo Alarm Services*, 907 F.2d 1274, 1278 (1st Cir.1990) (listing cases from six states holding that contract clauses limiting liability of burglar alarm services were enforceable); *Accord Schrier v. Beltway Alarm Co.*, 73 Md.App. 281, 533 A.2d 1316, 1319 (1987) (listing cases from 14 jurisdictions).

In *Leon's Bakery*, the Second Circuit reasoned that the rationale for permitting the provider of a burglar alarm system to limit its liability is equally applicable to the provider of a fire alarm system. *Id.* at 49. The court stated that the supplier of either type of system is paying for its equipment and service, and the price does not generally include a sum designed to anticipate the possible need to pay the purchaser the value of the property that the system is to protect. *Id.* "The owner or custodian of the property is in a far better position than the alarm system seller to know the property's value and to bargain with an insurance company for appropriate coverage and an appropriate premium...." *Id.* The court noted that the

alarm seller's ability to limit liability helps keep alarm services affordable. *Id.*

A limitation of liability clause identical to the clause at issue was upheld in *Lazybug Shops, Inc. v. American District Telegraph Co.*, 374 So.2d 183 (Ct.App.La.1979). The court held that the limitation of liability provision applied and the service provider's liability was restricted in accordance with the contract. *Id.* Because the contract was clear, specific, and would not lead to an absurd result, the limitation of liability clause must be given effect. *Id.* at 185.

An ADT contract with a similar limitation of liability clause was held to be enforceable by the Supreme Court of Idaho. *Steiner Corp. v. American District Telegraph*, 106 Idaho 787, 683 P.2d 435 (1984).[5] Because the court found that the plaintiff was effectively precluded from recovery by the limitation clause, ADT's liability could not be based upon any of the Plaintiffs' theories, i.e., negligence, breach of express and implied warranties, and strict liability in tort. *Id.* 683 P.2d at 437. Upholding the trial court's granting of summary judgment, the Idaho supreme court held that the limitation of liability clause must be given full force and effect, thus, limiting ADT's liability to the amount specified in the contract. *Id.* at 439–440.

A clause in a contract limiting liability for negligent acts does not serve to limit liability for wilful or wanton conduct. *Lenny's Inc.*, 318 S.E.2d at 142 (Allegations of Defendant's wilful and wanton conduct precluded granting of motion for summary judgment.); *Hawes v. Central of Ga. R. Co.*, 117 Ga.App. 771, 162 S.E.2d 14 (1968); *Corral*, 240 Kan.

**5.** The clause states:

D. It is understood that the Contractor is not an insurer, that insurance, if any, shall be obtained by the Subscriber and that the amounts payable to the Contractor hereunder are based upon the value of the services and the scope of liability as herein set forth and are unrelated to the value of the Subscriber's property of others located in Subscriber's premises. The Subscriber does not desire this contract to provide for full liability of the Contractor and agrees that the Contractor shall be exempt from liability for loss or damage due directly or indirectly to occurrences, or consequences therefrom, which the service is designed to detect or avert; that if the Contractor should be found liable for loss or damages due to a

failure of service or equipment in any respect, its liability shall be limited to a sum equal to ten percent of the annual service charge on [sic] $250, whichever is the greater, and that the provisions of this paragraph shall apply if loss or damage, irrespective of cause or origin, results directly or indirectly to person or property from performance or nonperformance of obligations imposed by this contract or from negligence, active or otherwise, of the Contractor, its agents or employees. The Department or other organization to which the connection is made may invoke the provisions hereof against any claims by the Subscriber due to any failure of such Department or organization.

678, 732 P.2d 1260, 1265 (1987) (Limitation of liability clause upheld due to lack of evidence of fraud, mistake, duress or wanton or wilful negligence, and contravention of public policy.); *Factory Insurance Association v. American District Telegraph Co.*, 277 So.2d 569, 570 (Fla.1973) (Limitation of liability clause would not preclude claims of gross, wanton and wilful negligence.).

Because the Court finds that there is no evidence of wilful or wanton conduct or gross negligence, summary judgment on the issue of limiting ADT's liability pursuant to paragraph "E" of the contract is granted.

### V. *Subrogation*

Plaintiff AMM has paid LEE $9,012,734.00 pursuant to a LEE/AMM insurance policy. (Pls.['] Opp. to Def.['s] Consol.Mot.Summ.J. Ex. 28). As a result, AMM asserts a subrogation interest for the monies it paid LEE in connection with the fire damage sustained. Defendant ADT claims that AMM's claim of subrogation must fail; alternatively, ADT argues that Plaintiff AMM is limited by the ADT/LEE contract.

The right of subrogation can arise from one of three sources. First, it is an equitable principle founded on the proposition that an insurer ought not to collect damages for his loss from both his insurer and the tortfeasor, a double recovery. *Carter v. Banks*, 254 Ga. 550, 330 S.E.2d 866, 867–68 (1985). Secondly, it may arise out of the contract between the insurer and the insured; this is sometimes referred to as conventional subrogation. *Id.* 330 S.E.2d at 868. Thirdly, the right may be declared by statute. *Id.*

In the case at bar, there is a subrogation agreement between LEE and AMM which states in pertinent part:

I. Transfer of Rights of Recovery Against Others To Us

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. (Pls.['']. Opp. to Def.['s] Consol.Mot.Summ.J. Ex. 28).

Subrogation is the substitution of another person in the place of a creditor, so that the substituted party succeeds to all the rights of the creditor. *Travelers Insurance Co. v. Commercial Union Insurance Co.*, 176 Ga.App. 305, 335 S.E.2d 681, 684 (1985). A subrogee is placed in the same position as the subrogor including the disabilities as well as the rights. *Id.* A subrogee cannot escape a limitation of liability clause in the service contract between the subrogor and the alarm company. *E.H. Ashley & Co. v. Wells Fargo Alarm Services*, 907 F.2d 1274, 1277 (1st Cir.1990).

Having examined the LEE/AMM contract, the Court finds that AMM would be entitled to assert its right of subrogation. However, since a subrogee is placed in the same position as the subrogor, including the disabilities as well as the rights, all claims asserted by AMM as subrogee are dismissed pursuant to this Court's granting of summary judgment as to all claims asserted by ADT.

### Conclusion

For the foregoing reasons, the Court finds that Defendant's Consolidated Motion for Summary Judgment is **GRANTED.**

SO ORDERED.